UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

:

ANTHONY CAMPBELL,                                     :

:

                                    Plaintiff,        :

:

                    v.                                :

:

CAROLYN W. COLVIN,                                    :

COMMISSIONER OF SOCIAL SECURITY,                      :

:

                                    Defendant.        :

------------------------------------------------------X

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #: _____              │
│ DATE FILED: September 11, 2015       │
└─────────────────────────────────────┘
```

14 Civ. 5385 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

Plaintiff Anthony Campbell filed this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of a decision by the Acting Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Supplemental Security Income ("SSI") and Social Security Disability Insurance benefits ("DIB") based on a finding that Plaintiff did not meet the Act's criteria for disability. The parties have filed cross-motions for judgment on the pleadings. Because the Commissioner's decision is supported by substantial evidence, Defendant's motion is granted, Plaintiff's motion is denied, and the ALJ's opinion is affirmed.

## BACKGROUND

Campbell first filed a Title II application for SSI and DIB on May 17, 2011, alleging disability as of June 22, 2009. (SSA Rec. 11). The Commissioner denied this initial claim on July 26, 2011. (*Id.*). Campbell subsequently received a hearing, pursuant to 20 C.F.R. § 404.929, at which he

appeared and testified with the assistance of counsel on September 10, 2012. (*Id.*).

## A.     Campbell's Account of His Physical Condition

Campbell described in his administrative hearing testimony an extensive history of medical procedures, primarily associated with recurring kidney stones. (SSA Rec. 40-41, 44-51, 61-62). He explained that his disability claim dated back to June 22, 2009, because upon that date his kidney problems became so severe that he rushed to the hospital to see his urologist. (*Id.* at 40). He returned to his job for a brief period following this hospital visit, but found that his condition (and, more particularly, his need to undergo screening and pre-operative testing) required him to miss too much work. (*Id.* at 41).

Campbell reported that since this first hospitalization, he had undergone a total of 23 surgical procedures related to his kidneys. (SSA Rec. 46). These procedures were conducted at outpatient facilities and typically did not require Campbell to stay overnight. (*Id.* at 62). He reported bleeding for about three days following each surgery, requiring him to wear Depends; he also noted that he would stay home lying on the floor all day for a long period of time after each procedure — and that he in fact spent much of his time at home lying on the floor. (*Id.*). Campbell reported that his kidney problems additionally required him to drink large amounts of water, leading him regularly to use the bathroom as frequently as four times in three hours (*id.* at 59) and causing him to keep a urinal in his car for emergencies (*id.* at 51).

Campbell described pain separate and apart from his kidney-related problems, resulting from an enlarged prostate that began causing him trouble in or about April 2010. (SSA Rec. 59-61). Campbell sat on a pillow at his administrative hearing to relieve the pressure on his prostate, and eventually switched to kneeling to relieve the pressure further. (*Id.* at 43, 59). Campbell reported pain running from his left kidney down to his testicles (*id.* at 44), and stated that on a scale of one to ten, with ten being the highest, his pain at the time of the hearing was a "five going to a six" (*id.* at 60).

In addition to his kidney and prostate problems, Campbell advised the ALJ of his hypertension and enlarged aorta. (SSA Rec. 42). He noted that he smoked approximately a third of a pack of cigarettes per day, and sometimes took Ambien to help him sleep. (*Id.* at 56-57). Campbell reported that his dosages of other medications had to be reduced to avoid nausea, and that even at the reduced level they made him drowsy. (*Id.* at 51, 60). Finally, he noted that he had lost significant weight — around 17 or 18 pounds — in the preceding six months. (*Id.* at 37).

Campbell reported that his wife did all of the shopping and cooking for the family and assisted him with bathing and shaving. (SSA Rec. 58). He stated that he could walk for a "couple of blocks" (or about eight or nine minutes) before having to stop. (*Id.* at 51-52). He estimated that he could stand for 30 to 40 minutes, sit for approximately 20 minutes, and lift around five pounds (though he also stated that he could lift a gallon of milk, which, as both parties have helpfully informed the Court, weighs approximately 8.5

pounds).  (*Id.* at 53-55; Pl. Br. 11 n.7; Def. Br. 11 n.7).  He reported no problems with stooping or squatting, and stated that he could bend if he braced himself.  (SSA Rec. 52-53).  He described some numbness in his left arm due to his reliance on that arm for support.  (*Id.* at 53).  Campbell alleged no cognitive impairment.  (*Id.* at 55-56).

**B.    Campbell's Work History**

Campbell has a high school education, and attended Mercy College for less than a year.  (SSA Rec. 39).  His most recent employment was as a case manager with the non-profit The Sharing Community, which provides transitional housing for mentally ill, chemically addicted ("MICA") individuals, as well as for handicapped individuals and those with HIV.  (*Id.* at 39-41).  Prior to his position as a case manager, Campbell served as a site supervisor for the same organization.  (*Id.* at 217).  In his more recent role managing cases, Campbell performed client intake functions, conducted interviews, and went on visits to housing programs.  (*Id.* at 41).  He described this job as involving two to three hours of walking, two hours of standing, and two to three hours of sitting per day.  (*Id.* at 216).  The only stooping, kneeling, or crouching required was to access the file cabinets.  (*Id.*).  Campbell also stated that he carried deliveries to the facility and would help carry individuals' things when they were moving in.  (*Id.*)  Campbell left his position at The Sharing Community shortly after his June 22, 2009 hospital visit, due to excessive absenteeism in addressing his kidney problems.  (*Id.* at 40-41).

C.    **Campbell's Medical History**

During the period from June 2009 through January 2012, Campbell saw at least five different doctors: two urologists, a nephrologist, a cardiologist, and his primary care physician. (SSA Rec. 235). Campbell has additionally undergone consultative examinations, both physical and mental, specifically for the purposes of his disability application. (*See generally id.* at 55, 338-64).

1.    **Campbell's Kidney Disease and Related Surgical Procedures**

On June 22, 2009, urologist Dr. Sherif El-Masry diagnosed Campbell with a left renal stone and performed a cystoscopy, using a holmium laser to break up the stone and placing a stent in Campbell's ureter. (SSA Rec. 662).[1] Over the following year, Dr. El-Masry performed 11 more outpatient surgical procedures — approximately one per month — on Campbell related to his chronic kidney stones. (*Id.* at 635-38, 661-87). Dr. El-Masry's treatment notes from a laser lithotripsy and stent replacement,[2] conducted on July 20, 2009, state that "[a] retrograde pyelogram was remarkable for multiple filling defects in the left kidney," and that multiple bladder stones were broken up using the

---

[1]    A cystoscopy is a procedure performed to allow a physician to examine the inside of a patient's bladder. The physician inserts a hollow tube equipped with a lens, called a cystoscope, into the patient's urethra and advances it into the bladder. Tests and Procedures: Cystoscopy, Mayo Clinic, http://www.mayoclinic.org/tests-procedures/cystoscopy/basics/definition/prc-20013535 (last visited Sept. 11, 2015). A holmium laser is a surgical tool that is used for, among other things, breaking up kidney stones. *See* Tim A. Wollin and John D. Denstedt, *The Holmium Laser in Urology*, 16 J. Clin. Laser Med. Surg. 13 (1998).

[2]    Lithotripsy uses shock waves, most commonly from outside the body, to fragment stones in the kidney, bladder, or ureter. The stone fragments then exit the patient's body through his or her urine. Lithotripsy, MedlinePlus, https://www.nlm.nih.gov/medlineplus/ency/article/007113.htm (last visited Sept. 11, 2015).

holmium laser.  (*Id.* at 667).[3]  In addition to lithotripsy and stent replacement procedures, Dr. El-Masry performed one endopyelotomy on Campbell, in September 2009, creating an incision to relieve obstruction of his ureteropelvic junction.  (*Id.* at 671).[4]  Dr. El-Masry reported no complications as a result of any of his procedures, and stated that Campbell tolerated them well.  (*Id.* at 661-87).  Dr. El-Masry did note "severe degenerative changes of the distal lumbar spine" during his September 24, 2009 follow-up exam, but did not address this in subsequent reports.  (*Id.* at 655).

Campbell's second urologist, Dr. Stanley Boczko, performed an additional eight surgical procedures to place and remove stents, and to break up existing kidney stones, during the period from September 2010 through August 2012.  (SSA Rec. 688-97).  Dr. Boczko's operative reports indicated no complications from any of the procedures (*id.*), though he too noted degeneration of Campbell's spine (*id.* at 552-53, 646).

On March 11, 2011, Dr. Boczko submitted a report diagnosing Campbell with renal and ureteral calculi (i.e., stones), noting, under the "current symptoms" field of the report form, "pain."  (SSA Rec. 333).  He stated that Campbell's ability to work "depends on whether he is passing any stone

---

[3]     A retrograde pyelogram is a type of x-ray that depicts the bladder, ureters, and renal pelvis.  Retrograde Pyelogram, John Hopkins Medicine, http://www.hopkinsmedicine.org/healthlibrary/test_procedures/urology/retrograde_ pyelogram_92,P07713/ (last visited Sept. 11, 2015).

[4]     An endopyelotomy is a procedure in which a physician makes an incision, via an instrument inserted through a long, thin tube equipped with a light and camera, to correct constriction of the ureter at the junction of the ureter and renal pelvis. Endopyelotomy, Mosby's Medical Dictionary, 8th ed. (2009), http://medical-dictionary.thefreedictionary.com/endopyelotomy (last visited Sept. 11, 2015).

fragments," and indicated that Campbell's condition had "markedly improved." (*Id.* at 334-35).

### 2.    Campbell's Enlarged Prostate

A pelvic sonogram administered to Campbell on July 27, 2010, showed an enlarged prostate.  (SSA Rec. 316).  The radiologist, Dr. Josephine Kwei, reported an impression of moderate prostatic hypertrophy — in other words, that Campbell's prostate cells were moderately enlarged — with no significant urinary retention.  (*Id.*).[5]  Dr. Boczko similarly noted an enlarged prostate on September 14, 2010.  (*Id.* at 549).

On April 13, 2012, Dr. Manash K. Dasgupta saw Campbell for a surgical follow-up, and reported that Campbell "continues to have pain in the left flank area, radiating anteriorly into his groin," purportedly from his kidney stones. (SSA Rec. 525).  Campbell additionally complained of constipation and inadequate emptying of his bladder.  (*Id.*).  Dr. Dasgupta did not have access to recent scan results and thus could make only limited findings, but suggested that the constipation might stem from Campbell's medications and the bladder problems could reflect an enlarged prostate.  (*Id.*).

---

[5]     When prostate cells become sufficiently enlarged, they can form discrete nodules that impinge on the urethra, consequently obstructing the flow of urine to the bladder and thereby resulting in retention of urine.  *See generally* James Tacklind *et al.*, Serenoa repens *for Benign Prostatic Hyperplasia*, Cochrane Database of Systematic Reviews (2012), available online at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0011032/ (last visited Sept. 11, 2015).

### 3. Campbell's Hypertension

Campbell further has a well-documented history of hypertension, for which he has been treated by primary care physicians Dr. Lawrence Neshiwat and Dr. John Muney, and by cardiologist Dr. Steven Francescone. (SSA Rec. 236). At a May 29, 2009 examination for complaints of fever and insomnia, Dr. Neshiwat recorded Campbell's blood pressure as 165/111. (*Id.* at 454).[6] At their next meeting, on August 26, 2009, Campbell's blood pressure was even higher, measuring at 181/122. (*Id.* at 451). At subsequent doctor's visits, Campbell's blood pressure level fluctuated between prehypertensive, first-degree hypertensive, and second-degree hypertensive (*id.* at 483 (blood pressure measured at 128/80 on February 17, 2010), 302 (175/111 on July 23, 2010), 304 (172/102 on July 30, 2010), 305 (151/94 on August 13, 2010), 306 (152/96 on August 27, 2010), 289 (140/87 on November 9, 2010), 399 (112/73 on December 20, 2010), 308 (154/97 on May 20, 2011), 309 (153/103 on May 27, 2011), 339 (140/84 on July 6, 2011)), though treatment notes from these visits indicate Campbell's inconsistent usage of his blood pressure medication (*id.* at 304 ("[patient] did

---

[6]     Blood pressure readings have two numbers, measured in millimeters of mercury (mm Hg). The first or upper number indicates systolic pressure, which is the pressure in an individual's arteries when his heart beats. The second or bottom number indicates diastolic pressure, which is the pressure in an individual's arteries between heart beats. Normal blood pressure is 120/80 mm Hg or lower. Prehypertension exists when an individual's systolic pressure is between 120 and 139 mm Hg, or his diastolic pressure is from 80 to 89 mm Hg. Stage 1 hypertension exists when an individual's systolic pressure ranges from 140 to 159 mm Hg, or his diastolic pressure is between 90 and 99 mm Hg. Stage 2 hypertension exists when an individual has a systolic pressure of 160 mm Hg or higher, or a diastolic pressure of 100 mm Hg or higher. High Blood Pressure (Hypertension), *Diseases and Conditions*, Mayo Clinic (2015) http://www.mayoclinic.org/diseases-conditions/high-blood-pressure/basics/definition/con-20019580?p=1 (last visited Sept. 11, 2015).

not take [blood pressure] pills this morning"), 305 ("[patient] did not take his meds today"), 306 (noting that patient took his medication only 20 minutes before the appointment)).

Campbell was finally hospitalized on May 22, 2012, due to uncontrolled hypertension.  (SSA Rec. 583-86 (blood pressure measured at 134/98)).  An electrocardiogram ("EKG") performed that day showed left ventricular hypertrophy,[7] T wave inversion,[8] and nonspecific wave abnormalities.  (*Id.* at 621).  A chest x-ray indicated that Campbell's heart was "borderline enlarged," but found no acute pathology.  (*Id.* at 629).  Further EKG testing performed three days later indicated possible ischemia, but no significant pauses or arrhythmias, and Campbell was asymptomatic during the exam.  (*Id.* at 630).

On May 25, 2012, the same day that these further EKGs were obtained, Campbell was admitted to Mount Sinai Hospital for chest pain.  (SSA Rec. 574).  He received a cardiac catheterization, which indicated mildly elevated left ventricular end diastolic pressure ("LVEDP"), normal coronary anatomy,

---

[7]  Left ventricular hypertrophy is enlargement and thickening of the walls of the heart's left ventricle, its main pumping chamber.  Left ventricular hypertrophy may occur as a result of hypertension or other medical conditions and is a risk factor for heart attack and stroke.  Left Ventricular Hypertrophy, *Diseases and Conditions*, Mayo Clinic (2015) http://www.mayoclinic.org/diseases-conditions/left-ventricular-hypertrophy/basics/definition/CON-20026690 (last visited Sept. 11, 2015).

[8]  T waves are outputs from an EKG, so named for their long, narrow, vertical trough extending farther below the baseline than above.  T waves may be inverted, such that they extend farther above the baseline than below, for benign reasons or as symptoms of an underlying medical condition.  William Brady, The Inverted T Wave: Differential Diagnosis in the Adult Patient, *Cardiovascular Diseases* (2014), http://www.consultantlive.com/cardiovascular-diseases/inverted-t-wave-differential-diagnosis-adult-patient (last visited Sept. 11, 2015).

normal systolic left ventricular function, and normal valve functioning.  (*Id.*).[9]
Campbell was advised to quit smoking and to monitor his other coronary artery
disease ("CAD") risk factors, and was released that same day with instructions
to schedule a follow-up appointment with cardiologist Dr. Francescone in two
to four weeks.  (*Id.*).

### 4.    Campbell's Consultative Examinations

In addition to seeing numerous treating physicians, Campbell underwent
two consultative exams, one physical and one mental, for the specific purpose
of disability assessment.  (SSA Rec. 338-46).  Dr. Mark Johnston conducted
the physical exam on July 6, 2011, and diagnosed Campbell with chronic back
and flank pain caused by kidney stones, atypical chest pain, and hypertension.
(*Id.* at 341).  He classified Campbell's prognosis as "fair."  (*Id.*).  During the
examination Campbell demonstrated no acute distress, and was able to squat
and stand without assistance, walk normally, and had full range of motion in
his joints.  (*Id.* at 339).  The only abnormal physical finding Dr. Johnston noted
was a positive left straight-leg test at 60 degrees.  (*Id.* at 340).[10]

---

[9]    Cardiac catheterization is a procedure used to diagnose and treat some heart
conditions, in which a long, thin, flexible tube (the catheter) is inserted into a blood
vessel and threaded into the patient's heart.  What is Cardiac Catheterization? National
Heart, Lung, and Blood Institute (2012), http://www.nhlbi.nih.gov/health/health-
topics/topics/cath/ (last visited Sept. 11, 2015).  LVEDP, measured via cardiac
catheterization, is the pressure at the end of the filling phase of the heart.  *See* Keith
Baker, *HST.151 Principles of Pharmacology, Spring 2005.* (Massachusetts Institute of
Technology: MIT OpenCourseWare), http://ocw.mit.edu/courses/health-sciences-and-
technology/hst-151-principles-of-pharmacology-spring-2005/lecture-
notes/0216_2_baker.pdf (last visited Sept. 11, 2015).

[10]    A straight-leg raising test is a diagnostic tool for determining whether a patient has
spinal nerve root irritation.  A positive test indicates likely irritation.  *See, e.g.,* Charlie
Goldberg, *Musculo-Skeletal Examination,* A Practical Guide to Clinical Medicine (2009),
https://meded.ucsd.edu/clinicalmed/joints6.htm (last visited Sept. 11, 2015).

Dr. Johnston listed seven medications that Campbell currently took: Potassium citrate to prevent kidney stone formation; Tamsulosin to treat consequences of his enlarged prostate; Lisinopril, Atenolol, and Amlodipine for his hypertension; Percocet for pain; and Hydrochlorothiazide to reduce fluid retention. (SSA Rec. 339). In addition to taking these prescribed medications, Campbell reported smoking approximately six cigarettes and drinking two glasses of wine per day, and smoking marijuana cigarettes once daily as needed to increase his appetite. (*Id.*).

Doctor Fredelyn Engelberg Damari performed Campbell's psychiatric consultative evaluation on July 12, 2011. (SSA Rec. 342). She noted no psychiatric history, other than situational bereavement counseling received when Campbell's brother passed away in 2007, after which he became depressed and ill. (*Id.*). Campbell reported that he currently felt unhappy and hopeless, had lost his usual interests, and was unable to "see [his] way out" due to his chronic kidney disease. (*Id.* at 343). He also described anxiety related to his health and his medical insurance. (*Id.*). Dr. Damari found no abnormality in Campbell's attention, concentration, memory, or general cognitive functioning. (*Id.* at 344-45). She noted that he socialized less than he previously had due to his kidney dysfunction, and that his decreased mobility prevented him from playing with his children as he once had. (*Id.* at 345). Dr. Damari concluded that Campbell was moderately impaired in his ability to deal with stress appropriately, and that his stress-related problems might "be significant enough to interfere with [his] ability to function on a daily

11

basis." (*Id.* at 345-46). Campbell makes no allegations of cognitive impairment in his present case. (*See id.* at 55-56).

## D.    The Administrative Proceedings

### 1.    The ALJ's Denial of Benefits

The ALJ issued a notice of unfavorable decision on March 1, 2013. (SSA Rec. 8-17). In his accompanying opinion, the ALJ walked through the SSA's prescribed five-step analysis for evaluating disability claims. *See* 20 C.F.R. § 404.1520(a)(1).[11] As a threshold matter, the ALJ found that Campbell met the insured status requirements of the Act through December 31, 2014, meaning that Campbell would need to establish disability on or before that date. (SSA Rec. 11).[12] Next, the ALJ determined that Campbell had similarly satisfied steps one and two of the disability analysis: (i) Campbell had not

---

[11]    The Second Circuit has described the five-step analysis as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [*per se*] disabled.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

> *Selian* v. *Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (quoting *Talavera* v. *Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)). "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step. *Butts* v. *Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

[12]    *See* 42 U.C.S. § 423(c) (setting forth insurance definitions and requirements for disability claimants).

engaged in substantial gainful activity since the alleged onset date of his disability, and (ii) he had three severe impairments — renal disease, hypertension, and an enlarged prostate.  (*Id.* at 13 (citing 20 C.F.R. §§ 404.1571 *et seq.*, 20 C.F.R. 404.1520(c))).

Having established the existence of severe impairments, the ALJ next considered whether any of these impairments, either individually or in combination, met or medically equaled the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1, such that Campbell would presumptively qualify as disabled.  (SSA Rec. 15).  The ALJ found that Campbell did not satisfy any of the relevant listings.  (*Id.*).  With particular respect to Campbell's mental status, the ALJ discussed in detail the report of consultative psychiatrist Dr. Damari.  (*Id.* at 13-14).  He noted her diagnosis of adjustment disorder with depressed mood, but found that taking the record as a whole, Campbell's depressed mood and anxiety did not cause more than minimal limitation on his ability to work and socialize, and was therefore not severe.  (*Id.* at 14).  He further acknowledged Dr. Damari's comment that "stress related problems may be significant enough to interfere with [Campbell's] ability to function on a daily basis," but found no corroborating evidence to show "that this possible interference has come to pass."  (*Id.*).

As the ALJ explained, "paragraph B" of 20 C.F.R. § 404, Subpart P, Appendix 1, sets out requirements for a *per se* finding of disability based on mental impairment.  (SSA Rec. 14).  To satisfy the "paragraph B" criteria, a claimant's mental impairment must result in at least two of the following:

marked restriction of activities of daily living; marked difficulties in maintaining

social functioning; marked difficulties in maintaining concentration,

persistence, or pace; or repeated episodes of decompensation, each of extended

duration. (*Id.* (citing 20 C.F.R. § 404, Subpt. P, App'x 1)).  The ALJ found that

Campbell had no more than mild limitations upon his ability to socialize and

perform activities of daily life; had no limitation upon his ability to maintain

concentration, persistence, or pace; and had demonstrated no extended periods

of decompensation. (*Id.*).  Hence, the ALJ determined, Campbell's condition did

not warrant a presumption of disability based on mental impairment. (*Id.*).

The ALJ then proceeded to step four of the SSA disability analysis, which

requires an ALJ to determine the highest level of work that a claimant could

perform given his impairments — his residual functional capacity ("RFC").  20

C.F.R. § 404.1545; 20 C.F.R. § 404.1520.  The ALJ found that Campbell had

the RFC to perform "light work," defined in 20 C.F.R. § 404.1567(b) as lifting no

more than 20 pounds at a time with frequent lifting of objects weighing up to

10 pounds; or work involving a good deal of standing, walking, or seated

pushing and pulling. (SSA Rec. 15).  In making this determination, the ALJ

adhered to a set two-step process:  First, he determined whether a medically

determinable impairment, physical or mental, had been shown that could

reasonably be expected to produce Campbell's symptoms. (*Id.* at 15-16).

Second, after finding such impairments, the ALJ evaluated the intensity,

persistence, and limiting effects of Campbell's symptoms to determine the

extent to which they limited his functioning. (*Id.* at 16).  The ALJ explained

14

that "[f]or this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the [ALJ] must make a finding on the credibility of the statements based on a consideration of the entire case record."  (*Id.*).

Applying this two-step process, the ALJ found that while Campbell's medically determinable impairments could reasonably be expected to produce his alleged symptoms, his reports regarding the intensity, persistence, and limiting effects of those symptoms lacked credibility in light of the record.  (SSA Rec. 16).  Specifically, the ALJ noted that despite Campbell having undergone numerous procedures related to his kidney problems, reports from Campbell's treating physicians failed to document any resulting physical limitations.  (*Id.* at 15).  An additional examination conducted by consulting physician Dr. Johnston was "essentially normal except for some limitation of motion in the lumbar spine," and the only additional limitation Dr. Johnston documented was a moderate restriction on bending and lifting due to back and flank pain. (*Id.* at 16).  Furthermore, while Campbell has admittedly had many surgical procedures for his kidney stones, these were performed in outpatient facilities and debilitated Campbell only for brief periods of time.  (*Id.*).  Thus, the ALJ found, Campbell's claim that he lacked the capacity to perform light work due to his medical conditions was not credible.  (*Id.* at 16-17).

Having found that Campbell had an RFC that allows for the performance of light work, the ALJ determined that Campbell could perform his past relevant work as a case manager and site supervisor.  (SSA Rec. 17).  The ALJ

15

noted that the physical and mental demands of such work, both generally and as actually performed by Campbell in the past, did not exceed the requirements of light work.  (*Id.*).  Consequently, because he retained the capability to perform his previous work, Campbell did not qualify as disabled under the SSA, and the ALJ did not need to proceed any further in his disability analysis. *See* 20 C.F.R. § 404.1520(f).

### 2.    The Appeals Council's Denial of Review and the Instant Litigation

On April 29, 2013, Campbell filed a request for review of the ALJ's decision denying him disability benefits.  (SSA Rec. 7).  The Appeals Council responded on May 14, 2013, finding no reason for review and consequently denying Campbell's request.  (*Id.* at 1).

Campbell then proceeded to file for relief in this Court.   He initiated this action on July 17, 2014. (Dkt. #1-2).  The Commissioner filed the Administrative Record and her answer on November 18, 2014.  (Dkt. #5-6). The parties proceeded thereafter to file competing motions for judgment on the pleadings: the Commissioner filed her motion on December 19, 2014 (Dkt. #9-10), and Plaintiff filed his motion on January 21, 2015 (Dkt. #16).

### DISCUSSION

Plaintiff premises his request for relief on three alleged errors by the ALJ, namely, that the ALJ (i) failed to consider adequately the medical evidence in the record; (ii) failed to evaluate properly Campbell's credibility; and (iii) erroneously concluded that Campbell could perform his past work.  (Pl.

Br. 13-16).  The Court finds no merit in any of Campbell's asserted arguments, and therefore affirms the ALJ's decision.

## A.   Applicable Law

### 1.   Motions under Federal Rule of Civil Procedure 12(c)

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  The standard applied to a motion for judgment on the pleadings is the same as that used for a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  *Sheppard* v. *Beerman*, 18 F.3d 147, 150 (2d Cir. 1994); *accord L-7 Designs, Inc.* v. *Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011).  When considering either type of motion, a court should "draw all reasonable inferences in [the nonmovant's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)).  A plaintiff is entitled to move forward if he alleges "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("[W]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge [plaintiff's] claims across the line from conceivable to plausible." (internal quotation marks omitted)).

17

## 2.    Review of Determinations by the Commissioner of Social Security

In order to qualify for disability benefits under the Act, a claimant must demonstrate his "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also Butts* v. *Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).  The claimant must also establish that the impairment is "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).  Furthermore, the disability must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3).

In reviewing the final decision of the Social Security Administration, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  A court must uphold a final SSA determination to deny benefits unless that decision is unsupported by substantial evidence or is based on an incorrect legal standard.  *Selian* v. *Astrue,* 708 F.3d 409, 417 (2d Cir. 2013) ("In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." (quoting

18

*Talavera* v. *Astrue*, 697 F.3d 145, 145 (2d Cir. 2012))); *see also* 42 U.S.C.
§ 405(g) ("If there is substantial evidence to support the determination, it must
be upheld.").  Where the findings of the SSA are supported by substantial
evidence, those findings are "conclusive."  *Diaz* v. *Shalala*, 59 F.3d 307, 312 (2d
Cir. 1995) ("The findings of the Secretary are conclusive unless they are not
supported by substantial evidence." (citing 42 U.S.C. § 405(g))).

"Substantial evidence" is "more than a mere scintilla.  It means such
relevant evidence as a reasonable mind might accept as adequate to support a
conclusion."  *Talavera*, 697 F.3d at 151 (quoting *Richardson* v. *Perales*, 402
U.S. 389, 401 (1971)).  The substantial evidence standard is "a very deferential
standard of review — even more so than the clearly erroneous standard."
*Brault* v. *Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (citation
omitted).  To make the determination of whether the agency's finding were
supported by substantial evidence, "the reviewing court is required to examine
the entire record, including contradictory evidence and evidence from which
conflicting inferences can be drawn."  *Talavera*, 697 F.3d at 151 (quoting
*Mongeur* v. *Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).

Finally, the presiding ALJ has an affirmative obligation to develop the
administrative record.  *See Lamay* v. *Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09
(2d Cir. 2009); *Casino-Ortiz* v. *Astrue*, No. 06 Civ. 155 (DAB) (JCF), 2007 WL
2745704, at *7 (S.D.N.Y. Sept. 21, 2007) (citing *Perez* v. *Chater*, 77 F.3d 41, 47
(2d Cir. 1996)).  This means that the ALJ must seek additional evidence or
clarification when the "report from [claimant's] medical source contains a

conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1).

## B.    Analysis

### 1.    Substantial Evidence Supports the ALJ's Decisions

In arguing that the ALJ "did not appropriately consider [Campbell's] complaints," Campbell does not identify any inconsistency between the ALJ's determination and the objective medical evidence in the record.  (Pl. Br. 13).  As noted above, the ALJ found that while Campbell indeed suffered from severe medical impairments — namely, kidney disease, hypertension, and an enlarged prostate — none of these conditions precluded Campbell from performing his past relevant work.  (SSA Rec. 13, 17).  According to Campbell's own brief, the record shows that (i) Campbell had elevated blood pressure, but a 2008 cardiac catheterization "found no evidence of any coronary disease," and a similar test in 2012 was largely normal; (ii) Campbell's prostate was enlarged, but "there was no indication that any surgical intervention or other significant treatment was needed"; and (iii) a 2011 evaluation of Campbell's renal disease specified no functional limitations.  (Pl. Br. 13-14).  Hence not only does Campbell fail to present any evidence suggesting that the ALJ erred in his assessment of Campbell's RFC, but Campbell in fact recites a number of points in support of the ALJ's determination.  As Campbell's brief aptly highlights, the record contains more than enough evidence to meet the deferential "substantial

evidence" threshold, and as a result the Court must uphold the ALJ's assessment of Campbell's RFC.

### 2.    The ALJ Properly Evaluated Campbell's Credibility

Campbell contends that the ALJ failed to assess correctly Campbell's credibility.  (Pl. Br. 14).  As the Court has outlined, the ALJ must apply a prescribed two-step process for assessing a claimant's credibility.  (*See* Background Sec. D(1), *supra.*)  The ALJ did so in this case.  (*Id.*).  Campbell nevertheless contends that the ALJ's evaluation was insufficient:  While Campbell admits that "the medical record failed to document the functional limitations alleged by [Campbell]," he nevertheless claims that the ALJ should have sought "clarification and additional information from Plaintiff's physicians to fill in any clear gaps."  (Pl. Br. 15).

The Second Circuit has explained that before the substantial evidence test can be met, a reviewing court

> must first satisfy [itself] that the claimant has had "a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." The need for this inquiry arises from the essentially non-adversarial nature of a benefits proceeding: the [Commissioner] is not represented, and the ALJ, unlike a judge in a trial, must himself affirmatively develop the record.

*Echevarria* v. *Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (quoting *Gold* v. *Secretary of HEW*, 463 F.2d 38, 43 (2d Cir. 1972)) (internal citations omitted).  The ALJ's duty to develop the record includes resolving apparent ambiguities relevant to the ALJ's disability determination, *see Corporan* v. *Comm'r of Soc. Sec.*, No. 12 Civ. 6704 (JPO), 2015 WL 321832, at

*30 (S.D.N.Y. Jan. 23, 2015); seeking information to fill in significant temporal gaps, *see Calzada* v. *Astrue*, 753 F. Supp. 2d 250, 273-74 (S.D.N.Y. 2010) (finding that the ALJ failed to develop the record adequately where a two-year gap in the record existed and evidence suggested the claimant's condition likely changed during that period); and obtaining any other "necessary information," 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1).

Nothing in the present case suggests that further development of the record was necessary for a full hearing of Campbell's claim.  Campbell's medical record contains no apparent factual ambiguities, nor are there obvious gaps in the information provided.  Notably, Campbell submitted a detailed timeline of his medical history, covering the period from September 2008 through August 2012, that reflected frequent medical treatments for Campbell's kidney condition.  (SSA Rec. 634-38).  And as for any possible contradictions in the record, Campbell's brief disclaims any assertion of unresolved factual ambiguities in this case by copying the fact section of the Commissioner's brief verbatim.  (*Compare* Pl. Br. 2-11, *with* Def. Br. 2-11). Finally, the ALJ in his opinion explicitly acknowledged the need for a fully developed record, noting that Campbell's treating physicians had not documented any physical limitations resulting from his many medical procedures, and that consequently the SSA had ordered a consultative internal medicine examination — which the ALJ then described and took into account. (SSA Rec. 15-16).  In sum, the record contained sufficient evidence to allow for a full hearing of Campbell's claims, and the ALJ was under no duty to develop

it further.  The ALJ's finding that the record did not support Campbell's claims regarding the functional limitations imposed by his medically determinable impairments thus stands.

### 3. The ALJ Properly Determined That Campbell Could Perform His Past Relevant Work

Campbell's final argument asserts that the ALJ incorrectly found him capable of performing his past relevant work, and that therefore the ALJ erred in failing to proceed to step five of the disability inquiry.  (Pl. Br. 16).  A claimant will be deemed not disabled for the purposes of the Act if he retains an RFC sufficient to perform either the actual demands and duties of a previously held job or the demands and duties of the job as required by employers generally.  *See Jock* v. *Harris*, 651 F.2d 133, 135 (2d Cir. 1981) (quoting *Pelletier* v. *Secretary of H.E.W.*, 525 F.2d 158, 160 (1st Cir. 1975)) ("it was not enough for [the claimant] to show simply that her specific job … entailed exposure to smoke and fumes, she would have to show that such exposure would be a condition of this sort of work generally"); *Barone* v. *Astrue*, No. 09 Civ. 7397 (KBF) (DF), 2011 WL 7164421, at *8 (S.D.N.Y. Dec. 27, 2011) ("The term past relevant work means work performed, either as the claimant actually performed it or as it is generally performed in the national economy.").

According to Campbell, his previous jobs involved "lifting, sitting, standing, and walking requirements that fall within the definition of light work." (Pl. Br. 16; *see also* SSA Rec. 216-17 (Campbell's descriptions of his previous work's functional requirements)).  It seems then that Campbell and the ALJ are in agreement regarding the requirements of Campbell's previous

23

positions and their classification as "light work"; the remaining question is whether Campbell has the RFC to perform light work.

"An RFC finding will be upheld when there is substantial evidence in the record to support each requirement listed in the regulations." *Goodale* v. *Astrue*, 32 F. Supp. 3d 345, 356 (N.D.N.Y. 2012); *see also Restrepo* v. *Colvin*, No. 12 Civ. 4837 (LGS) (FM), 2014 WL 815338, at *18 (S.D.N.Y. Mar. 3, 2014); *see also Jimenez* v. *Astrue*, No. 12 Civ. 3477 (GWG), 2013 WL 4400533, at *12 (S.D.N.Y. Aug. 14, 2013).  According to 20 C.F.R. § 416.967, in order to have the RFC necessary to perform "light work," a claimant must be able to lift up to 20 pounds at one time; frequently lift or carry objects weighing up to 10 pounds; stand and walk; and push and pull with his arms while seated. Substantial evidence in the record supports the ALJ's finding that Campbell can perform these requirements.  Dr. Johnston's report from July 6, 2011, indicated full joint motion, normal gait, the ability to walk on heels and toes, and no neurological difficulties.  (SSA Rec. 339).  The only limitation reflected in Dr. Johnston's report is a "moderate restriction of bending and lifting" (*id.* at 341), which would not preclude performance of light work.  *See, e.g.*, *Thomas* v. *Colvin*, No. 14 Civ. 7206 (RA) (AJP), 2015 WL 4567400, at *7 (S.D.N.Y. July 30, 2015) (upholding the findings of an ALJ who gave "significant weight" to a physician's assessment that claimant had "moderate restriction for heavy lifting and carrying" and who then found claimant capable of the range of "light work"); *Duran* v. *Colvin*, No. 14 Civ. 4681 (AJP), 2015 WL 4476165, at *14 (S.D.N.Y. July 22, 2015) (finding claimant's "moderate restriction for bending,

lifting, pushing, pulling, squatting, and walking" did not preclude performance of the range of light work).  Dr. Boczko, who has performed numerous procedures on Campbell, declined to indicate any ongoing limitations on sitting, standing, walking, lifting, pushing, or pulling in the respective fields provided on a Determination of Disabilities Questionnaire, instead stating only that "[Campbell's] ability to work depends on whether he is passing any stone fragments." (SSA Rec. 335-36).  At his administrative hearing, Campbell testified that he can stand, walk, bend (while bracing himself with his arm), stoop, and squat, and that he regularly carries grocery bags or a gallon of milk. (*Id.* at 51-55).  He further testified that he left his job as a case manager, not due to an inability to perform the required functions, but because the screening he was undergoing at the time caused him to miss too many days of work.  (*Id.* at 41).[13]  Considering the entirety of the record, the Court finds that

---

[13]     The Court recognizes that a relevant factor in determining a claimant's RFC is the ability to work a consistent schedule.  *See, e.g., Melville* v. *Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2) ("Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.").  Thus the Court acknowledges that Campbell's periodic limitations are relevant to his RFC determination, apart from any continuous functional limitation he might also suffer.  However, Campbell has not argued that periodic limitations inhibit his ability to work; rather his argument focuses on the functional requirements of his prior positions.  (*See* Pl. Br. 16).  Furthermore, while Campbell has had numerous medical procedures and doctors visits, no evidence has been presented to show that such interruptions preclude his keeping a generally normal schedule.  (*See, e.g.*, SSA Rec. 63 (testimony by Campbell at his administrative hearing that he had no surgeries scheduled for the near future); *id.* at 334 (report from treating physician Dr. Boczko describing the expected duration and prognosis of Campbell's condition as "markedly improved")).

substantial evidence supports the ALJ's RFC finding; that finding must therefore be affirmed.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is affirmed; Defendant's motion for judgment on the pleadings is GRANTED; and Plaintiff's motion for judgment on the pleadings is DENIED.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:  September 11, 2015
        New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

26